# INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1. | Complaint |
| 2. | Summons |
| 3. | Civil Cover Sheet |
| 4. | Certificate of Compulsory Arbitration |
| 5. | Waiver of Service of Process |
| 6. | Amended Complaint |
| 7. | Application to Withdraw As Counsel of Record With Consent; Proposed Order Granting Withdrawal as Counsel of Record with Consent |
| 8. | Pinal County Superior Court Docket obtained from eAccess on 12/05/2022 |
| 9. | Notice of Removal of Action to the United States District Court, District of Arizona |

# EXHIBIT 1

**Jaburg & Wilk, P.C.**
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
602.248.1000

Alden Thomas (031900)
aat@jaburgwilk.com

*Attorney for Plaintiff*

# SUPERIOR COURT OF ARIZONA
## COUNTY OF PINAL

| | |
|---|---|
| STEFANOS PONTIKIS,<br><br>              Plaintiff,<br><br>      v.<br><br>LUCID USA, INC., a Delaware corporation, d/b/a LUCID MOTORS,<br><br>              Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff Stefanos Pontikis alleges:

## PARTIES, PROCEDURAL HISTORY, JURISDICTION, AND VENUE

1.     Plaintiff Stefanos Pontikis is a Texas citizen currently residing in Southlake, Tarrant County, Texas.

2.     From January 4, 2021 through April 10, 2021, Pontikis worked as a "Logistics Operations Supervisor" ("LOS") for Defendants Lucid USA, Inc., d/b/a Lucid Motors ("Lucid").

3.     Lucid is an American electric vehicle manufacturer.

4.     Lucid is headquartered in California and was incorporated in Delaware.

5.     Lucid is and was at all times pertinent registered to do business in Arizona.

6.     Lucid's manufacturing operations are located in or around Casa Grande, Arizona.

7.      Lucid is a citizen of Pinal County, Arizona, because a corporation resides for venue purposes in any district where the defendant corporation is subject to personal jurisdiction when the suit is filed.

8.      Pontikis was previously employed by Lucid and a dispute between the parties arose from that employment relationship.

9.      On June 23, 2021, Pontikis filed suit against Lucid in the Alameda County Superior Court of California, Case No. RG21102685 ("California Lawsuit").

10.     All claims Pontikis raised in the California Lawsuit arose under California law, including claims for retaliation/constructive discharge in violation of Cal. Lab. Code § 1102.5 and unlawful discrimination/retaliation in violation of the Fair Employment and Housing Act ("FEHA").

11.     The protections afforded by Cal. Lab. Code § 1102.5 are substantively identical to those provided by A.R.S. §§ 23-1501, 1502.

12.     FEHA mirrors Title VII of the Civil Rights Act of 1964.

13.     On January 6, 2022, the court granted Lucid's Motion to Dismiss Based upon Forum Non Conveniens in part, holding "Arizona provides a suitable alternative forum for [Pontikis's] claims."

14.     The Court stayed the California Lawsuit "while [Pontikis] pursues his claims against [Lucid] in an appropriate venue in Arizona."

15.     On January 25, 2022, Pontikis filed a Notice of Appeal, and his appeal of to the trial court's ruling on Lucid's Motion to Dismiss Division Based upon Forum Non Conveniens is pending before the California Court of Appeals, Division Two ("California Appeal").

16.     On April 1, 2022, Pontikis and Lucid entered into a tolling agreement, which tolled the statute of limitations of claims which have not already been time-barred until September 30, 2022.

2

17.     Although Pontikis maintains that the statute of limitations applying to his claims against Lucid are nevertheless tolled while the California Appeal is pending, he files this action in an abundance of caution.

18.     This Court has jurisdiction over this matter under A.R.S. § 12-123.

19.     Without waiving arguments raised in the California Appeal, this court provides an alternative venue for this dispute in the event the California Appeal is denied.

20.     Pontikis files this matter to preserve his claims in the event the California Appeal is denied. He respectfully requests that the Court stay this action, pending the resolution of the California Appeal.

## GENERAL ALLEGATIONS

21.     On December 9, 2020, Lucid offered Stefanos Pontikis the position of Logistics Operations Supervisor at its Casa Grande, Arizona location.  The letter offering him this position stated that he would be directly reporting to Operations Manager David Tasker.

22.     Pontikis's understanding when accepting Lucid's job offer was that, as a condition of his acceptance of the offer, he would be promoted into a managerial role sometime during the second quarter of 2021 or when the first managerial slot/requisition opened up in the Operations Department.

23.     On January 4, 2021, Pontikis started work as a Logistics Operations Supervisor for Lucid.

24.     Within a few weeks of starting work for Lucid, Pontikis contracted the COVID-19 virus.

25.     On or about January 20, 2021, Pontikis informed his Logistics Operations Manager and supervisor, David Tasker, that he tested positive for COVID-19.

26.     On or about January 26, 2021, in response to receiving information that Pontikis had tested positive for COVID-19, Tasker gave him a direct order to make a

1  false statement to Lucid's HR department regarding Pontikis' contact with other
2  employees shortly before he tested positive for COVID-19.

3       27.    Lucid's Logistics Manager David Tasker via text message and verbally
4  explained to Pontikis that he did not want to have to quarantine his entire staff and risk
5  shutting down operations on account of Pontikis testing positive for COVID-19.

6       28.    Despite his own reservations, Pontikis deferred to Tasker and decided to
7  follow the direct order given to him by his supervisor.

8       29.    In a February 8, 2021 meeting that Pontikis requested with Craig Watson,
9  Pontikis felt compelled to express his concerns regarding the direct order given to him
10 by Tasker and the status of his fulfillment of that order.

11      30.    During this meeting, Pontikis explained he was going to recant the false
12 statement David Tasker directed him to make and correct the record with HR.

13      31.    Pontikis reported his concerns because he had a reasonable basis to believe
14 Tasker's directive violated Arizona law and/or public policy.

15      32.    For example, A.R.S. § 36-621, *et. seq.* outline specific requirements for the
16 reporting of infectious and contagious diseases to appropriate government personnel.

17      33.    A.R.S. § 36-624 permits county health departments to adopt quarantine and
18 sanitary measures to prevent the spread of  infectious and contagious diseases.

19      34.    As all relevant times, Pinal County had adopted CDC recommendations for
20 quarantine and isolation related to COVID-19.

21      35.    In response, Watson did not take any action to address the issue.  Instead,
22 he presented several options/scenarios to Pontikis:

23           a.    say nothing to HR and pretend the issue never happened;

24           b.    inform HR and correct the record but to expect retaliation from
25 Tasker based on his temperamental nature;

26           c.    Watson could relocate either Pontikis or Tasker to a different *off-*
27 *site* Lucid location in an attempt to avoid any potential conflict or retaliatory actions taken

28

4

1   by Tasker as a result of Pontikis's report to HR; and/or

2          d.      Pontikis could expect a write-up to be placed in his *"jacket"*

3   (employee record) from Watson that would prohibit him from receiving a promotion to

4   manager once an opening became available in the second financial quarter of 2021.

5          36.     On or about February 10, 2021, Pontikis recanted his original statement to

6   HR and explained the burden placed on him by his manager.   HR launched an

7   investigation led by Imari Henderson, the Employee Relations Partner ("ERP") who

8   interviewed all involved parties.   The investigation was concluded on March 18, 2021,

9   but Defendant did not inform Pontikis as to what actions would be taken going forward.

10         37.     On or about the first week of March 2021, Pontikis was struggling to

11  understand how employee morale was so low.   He began asking some of his coworkers

12  as to their perceived reasons for such a hostile and antagonistic work environment at

13  Lucid.

14         38.     Upon asking his coworkers about their perceived reasons for the hostile and

15  antagonistic work environment at Lucid, Pontikis was informed that an employee chat

16  group existed on an application known as "WhatsApp," of which Pontikis was not a

17  member.   The purpose of the forum/chat group was to vent and discuss personal and

18  work-related issues both directly and indirectly related to Lucid operations.   Plaintiff was

19  presented with some of the content from the chat group upon request.

20         39.     After reporting to HR the directive he was given by Tasker to provide false

21  information, Pontikis began experiencing retaliation in various forms.   For example, on

22  or about March 16, 2021, at approximately 8:30 a.m., Pontikis was approached by Tasker

23  and interrogated about his work attire.   In particular, Pontikis was asked why he was not

24  wearing his company shirt.

25         40.     Pontikis explained he was, indeed, wearing such attire underneath his

26  sweater because it was extremely cold on the dock during the morning hours.   Pontikis

27  has always worn a casual, polo sweater during the morning hours on the dock which

28

5

covered his company shirt and had never been approached or questioned by Tasker as to such attire until the close of the investigation on the Complaint Pontikis submitted to HR.

41.     The Employee Handbook, at page 14, requires employees to "maintain the highest standards of personal cleanliness and present a neat, professional appearance at all times."  It does not require employees to wear company shirts.  In fact, to the contrary, the Employee Handbook gives employees discretion in how they satisfy such standard: "All employees should use discretion in wearing attire that is appropriate for the office and customer interaction."

42.     Tasker, who had never previously made any statements about Pontikis's dress attire prior to March 16, 2021, stated, "Watson will not be happy with you for not wearing your company polo shirt" and walked away.

43.     Another co-worker who wore similar attire as Pontikis (an athletic hooded sweatshirt) who was in the direct walking path of Tasker was never approached or questioned about his attire.

44.     The Lucid work culture, pertaining to the logistics department, is and was at all times relevant a very close-knit group of employees that frequently engaged in various after-work activities.

45.     On or about March 19, 2021, Pontikis was attending a birthday party event for another supervisor.  The other supervisor invited Pontikis.

46.     At that party, Pontikis was informed by two other work colleagues that Pontikis's Logistics Manager David Tasker stated to them that he was very displeased by Pontikis's presence at the event.

47.     The same two co-workers informed Pontikis that Tasker was displeased by his presence at the party also informed Pontikis that Tasker did not want Pontikis to continue his employment with Lucid.

48.     Pontikis received unwelcomed, unprofessional, and unpleasant gestures from Tasker during the event to such an extent that Pontikis grew increasingly disturbed

6

and felt extremely ostracized. It became very apparent shortly after Pontikis arrived at the party that Tasker was retaliating against him by making unsolicited, disparaging comments to other employees about Pontikis.

49.     At one point during the party, Tasker's spouse approached Pontikis and expressed her sympathies in relation to Pontikis having to work for her husband.  Tasker was completely disengaged with Pontikis throughout the event and eventually left, disgruntled by Pontikis's presence, as Pontikis's two co-workers expressed earlier that evening.

50.     On or about March 22, 2021, Pontikis was asked why he did not attend an off-work event on March 20, 2021.  The event was hosted at Tasker's home.  Pontikis was informed that all the employees in Pontikis's department were in attendance. Pontikis informed them that Tasker did not extend him an invitation.

51.     Pontikis's coworker further stated that he was directed to destroy and delete all messages in his WhatsApp group account for fear that such communications would "possibly expose them all and their behaviors."

52.     Pontikis's health was regressing due to the workplace issues he was experiencing, which directly impacted his known disability.

53.     On or about March 23, 2021, Pontikis submitted a time-off request via email to Tasker requesting April 9, 2021 off so he could travel home for a medical appointment to obtain his COVID-19 vaccination.

54.     On March 23, 2021, Pontikis sent HR a letter via email, wherein he expressed concerns related to his work relationship with Tasker and the toxicity of the work environment, which Pontikis felt was being fueled by Tasker.

55.     In Pontikis's March 23, 2021 letter to HR, he raised concerns about the toxicity and hostile nature of the work environment at Lucid.

7

56.     In Pontikis's March 23, 2021 letter, he included various examples of inappropriate messages and images expressed on a group chat amongst Lucid employees on the application WhatsApp.

57.     The messages from the group chat contained references to people on Lucid's management team as "faggots" and "gay pussies."

58.     The messages joked about employees in leadership roles being drunk or intoxicated during work hours on Zoom meetings.

59.     The messages exchanged often contained extremely inappropriate, perverted, vulgar, racist, sexist, homophobic, disrespectful, degrading to people with disabilities, demeaning of the Jewish community, and insulting to people falling within other various protected classes under Title VII.

60.     Some of the images sent include fully exposed male genitalia. Others depicted women simulating sex acts.

61.     Although Pontikis found all of these images and messages highly offensive, he took particular offense to the degrading messages and images depicting disabled individuals in perverse ways because he is disabled.

62.     The group chat consisted primarily of Lucid employees and was created by Senior Logistics Manager Craig Watson and categorized as "(Not work related) Team," but many of the messages themselves reference work and work-related matters.

63.     After Pontikis reported these to HR, Lucid's Employee Relations Partner Imari Henderson and HR opened a second investigation.

64.     After reporting to HR, Pontikis experienced numerous instances of retaliation.

65.     On March 24, 2021, Tasker rejected Pontikis's request for paid sick time.

66.     One of Pontikis's coworkers informed him that Watson directed this coworker to "stay away and distance himself" from Pontikis.  The reason stated for the request was that Watson could not yet fire Pontikis and if he did it would cause a "shit

8

storm." The coworker further stated that this order included a negative ultimatum if he did not comply.

67.     On or about March 25, 2021, Craig Watson informed Pontikis that he (Watson) no longer planned to promote Pontikis to Logistics Operations Manager as promised prior to Pontikis being hired.  Instead, Watson informed Pontikis that, when the next Logistics Operations Managerial position opened up, one of the members of the group chat—Kevin Rafferty—would fill it.  He further noted that plans were underway to sponsor his expired immigrant work visa.

68.     When faced with the imminent likelihood that he would be terminated (which Watson and Tasker repeatedly expressed they planned to do) and his toxic and hostile work environment, Pontikis tendered his resignation effective April 10, 2021.

69.     At all times pertinent hereto, Lucid was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Defendant.

70.     At all times pertinent hereto, Lucid's conduct as well as that of its agents, servants, and/or employees was egregious, malicious, intentional, willful, reckless, and in habitual and negligent disregard for state laws and the rights of the Plaintiff herein.

71.     The perpetrators of the illegal offenses directed at Pontikis are still presently employed by Lucid. Considering this fact, a reasonable person faced with the intolerable employer actions or conditions of employment would have no reasonable alternative except to resign as the threat of ongoing retaliation would always be imminent.

72.     Pontikis filed a charge for discrimination with the EEOC.

73.     Pontikis filed the California Lawsuit within 90 days of receiving a Right to Sue Letter from the EEOC.

74.     Among other things, the complaint filed in the California Lawsuit alleges Pontikis experienced retaliation for reporting the discriminatory messages/images sent to him in the WhatsApp chat.

75.     It also alleges Pontikis's working conditions became so intolerable that he felt compelled to resign.

## COUNT ONE

**FAILURE TO PROVIDE PAID SICK TIME IN VIOLATION OF A.R.S. § 23-373**

76.     Pontikis repeats and realleges each allegation of this Complaint as if fully set forth in this claim.

77.     Arizona adopted a paid sick-time law that mandates that an employee may use his paid sick time ("PST") for any qualifying reason, including when the employee is suffering from a physical illness or a health condition. *See* A.R.S. § 23-373(A)(1).

78.     It "unlawful for an employer or any other person to interfere with, refrain, or deny the exercise of, or the attempt to exercise" an employee's right to take paid sick time.  A.R.S. § 23-374(A).

79.     "An employer may not require, as a condition of an employee's taking earned paid sick time, that the employee search for or find a replacement worker to cover the hours during which the employee is using earned paid sick time." A.R.S. § 23-373(E).

80.     As set forth herein, Pontikis requested to use paid sick time, and his request was wrongfully denied because there was another supervisor that would be out that day.

81.     Pursuant to A.R.S. § 23-364(G):

Any employer who fails to pay the wages or earned paid sick time required under this article shall be required to pay the employee the balance of the wages or earned paid sick time owed, including interest thereon, and an additional amount equal to twice the underpaid wages or earned paid sick time.

82.     Pontikis is entitled to a judgment for triple the amount of his unpaid sick time plus interest thereon and mandatory attorneys' fees. A.R.S. § 23-364(G).

## COUNT TWO

**UNLAWFUL RETALIATION IN VIOLATION OF A.R.S. § 23-374**

83.     Pontikis repeats and realleges each allegation of this Complaint as if fully set forth in this claim.

84.    Arizona adopted a paid sick-time law that mandates an employee may use his paid sick time ("PST") for any qualifying reason, including when the employee is suffering from a physical illness or a health condition. *See* A.R.S. § 23-373(A)(1).

85.    The PST Act contains an anti-retaliation provision that states:

> An employer shall not engage in retaliation or discriminate against an employee or former employee because the person has exercised rights protected under this article.

A.R.S. § 23-374.

86.    A.R.S. § 23-364(B) states: "Taking adverse action against a person within ninety days of a person's engaging in the foregoing activities *shall raise a presumption that such action was retaliation, which may be rebutted by clear and convincing evidence* that such action was taken for other permissible reasons." (Emphasis added.)

87.    Furthermore, A.R.S. § 23-364(G), the statute's anti-retaliation provision, states:

> Any employer who retaliates against an employee or other person in violation of this article shall be required to pay the employee an amount set by the commission or a court sufficient to compensate the employee and deter future violations, but not less than one hundred fifty dollars for each day that the violation continued or until legal judgment is final.

A.R.S. § 23-364(G).

88.    As set forth above, the Defendants retaliated against Pontikis within 90 days after he requested and was denied paid sick time.

89.    Defendants have the burden to prove, by clear and convincing evidence, that each of their adverse actions taken against Pontikis was wholly unrelated to his request to use paid sick time at a time that Defendants found to be inconvenient.

90.    Defendants must pay Pontikis a *minimum* of $150 per day from the date of the initial act of retaliation, March 23, 2022, when it first denied his request for paid sick time and subsequently retaliated against Pontikis for requesting to use paid sick time, until this matter resolves.

11

**COUNT THREE**

**WRONGFUL TERMINATION/CONSTRUCTIVE DISCHARGE**

91.    Pontikis repeats and realleges each allegation of this Complaint as if fully set forth in this claim.

92.    Pursuant to A.R.S. § 23-1501(A)(3)(c)(ii), "An employee has a claim against an employer for termination of employment if terminated for . . .

a.    The refusal by the employee to commit an act or omission that would violate the Constitution of Arizona or the statutes of this state.  A.R.S. § 23-1501(A)(3)(c)(i).

b.    The disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer . . ." A.R.S. § 23-1501(A)(3)(c)(ii).

93.    Lucid violated A.R.S. § 23-1501(A)(3)(c)(i) and (c)(ii) when it retaliated against Pontikis for refusing to withhold information about his COVID-19 diagnosis so that other employees could be made aware of their potential exposure and act accordingly.

94.    Pontikis notified HR of the directive he was given by his Operations Manager David Tasker to provide false information regarding his exposure to other Lucid employees around the time he contracted COVID-19.  He believed such directive to be in violation of Arizona law and public policy, including but not limited to:

a. A.R.S. § 36-621; and

b. A.R.S. § 36-624.

95.    Pontikis also notified HR of the retaliation he was experiencing, various aspects of the hostile and toxic work environment he was experiencing, and the insulting, demeaning, and harassing communications being circulated by other employees—

1   including those in management.  He reported he believed such conduct to be in violation

2   of Arizona law and public policy.

3       96.     As set forth herein, Lucid retaliated against Pontikis in a multitude of

4   ways—aggregating to create an overall toxic and hostile working environment—such

5   that any reasonable person would feel compelled to resign, including but not limited to:

6            a.     Being passed up for a promotion to Logistics Manager that he was

7   promised when hired that he would receive in the second quarter of 2021;

8            b.     Being publicly reprimanded for violating company policies that did

9   not exist and/or were not uniformly applied to all employees;

10           c.     Prohibiting at least one other Lucid employee from communicating

11  with or interacting with Pontikis;

12           d.     Making negative and derogatory comments about Pontikis to his

13  coworkers when he was not present;

14           e.     Expressing to Pontikis's coworkers an intent to terminate Pontikis's

15  employment with Lucid at an unspecified future date; and

16           f.     Ostracizing him and failing to include him in work-related

17  conversations and electronic correspondence utilized for work- and non-work-related

18  communications.

19      97.     As a result of this retaliation, Pontikis felt compelled to resign, which

20  amounted to a constructive discharge.

21      98.     Pontikis was constructively discharged from his position at Lucid because

22  of its discriminatory and retaliatory conduct. *See* A.R.S. § 23-1502 ("[A] constructive

23  discharge is functionally the same as an actual termination."); *see also Pennsylvania State

24  Police v. Suders*, 542 U.S. 129, 148 (2004).

25      99.     To add insult to injury, Pontikis was informed that the management

26  position he was told he would get when he was hired would be given to one of the people

27  who was in the chat group that exchanged wildly inappropriate messages without

28

13

1  reporting them, making it all too clear to him that keeping silent about illegal activities

2  was something that would be rewarded but reporting such would lead to retaliation.

3      100.    Pontikis was not required to provide notice of his constructive discharge to

4  Defendants prior to his resignation, because they exhibited "outrageous conduct" as well

5  as "a continuous pattern of discriminatory harassment" by refusing to address the

6  complaints Pontikis made and permitting Striker, Watson, and others to repeatedly

7  retaliate against Pontikis for his reports. *See* A.R.S. § 23-1502(A)(2).

8      101.    However, Defendant likely waived its right to notice under A.R.S. § 23-

9  1502(A)(1) because to Pontikis's knowledge, it never posted the requisite notice to

10  employees of their rights, as outlined A.R.S. § 23-1502(E).

11      102.    If so, Pontikis need only provide "[e]vidence of objectively difficult or

12  unpleasant working conditions to the extent that a reasonable employee would feel

13  compelled to resign" to prevail on his constructive discharge claim. *See* A.R.S. § 23-

14  1502(A)(1). For the reasons set forth herein, the difficult and unpleasant working

15  conditions Pontikis was subjected to meet this standard.

**COUNT FOUR**

**UNLAWFUL RETALIATION UNDER TITLE VII**

18      103.    Pontikis realleges each allegation of this complaint as if fully set forth in

19  this claim.

20      104.    Title VII also provides that it unlawful for an employer to retaliate against

21  an employee for engaging in a protected activity.  42 U.S.C. § 2000e-3(a).

22      105.    Pontikis was engaged in a protected activity when he reported the

23  discriminatory messages and images sent to him in the WhatsApp chat. These exchanged

24  demeaned individuals based upon their inclusion in a protected class, including but not

25  limited to, women, disabled individuals, racial minorities, religious minorities, etc.

14

106.   Lucid retaliated against Pontikis for engaging in this protected activity by, among other things, denying him a promotion, ostracizing him, and subjecting him to intolerable working conditions.

107.   As a direct and proximate result of the Lucid's unlawful retaliatory acts and omissions, Pontikis has suffered damages that arise out of, without limitation, lost wages, lost career advancement opportunities, attorney fees and costs, mental anguish, emotional distress, pain and suffering, humiliation, harm to reputation, and loss of enjoyment of life.

## REQUEST FOR RELIEF

WHEREFORE, Pontikis requests a judgment against Defendants as follows:

A.   For lost wages and benefits;

B.   For front pay and benefits;

C.   For damages for emotional distress and mental anguish;

D.   For damages for harm to reputation;

E.   For compensatory damages;

F.   For consequential damages;

G.   For punitive damages;

H.   For prejudgment interest at the highest legal rate from the date due until the date of Judgment;

I.   For reasonable attorneys' fees pursuant to A.R.S. § 23-1502 and  A.R.S. § 23-364;

J.   For costs;

K.   For interest on the foregoing amounts at the highest legal rate from the date of Judgment until paid; and

1     L.     For such other and further relief as is proper and just.

3     DATED this 30th day of September, 2022.

**Jaburg & Wilk, P.C.**

*/s/ Alden A. Thomas*
Alden A. Thomas
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
*Attorney for Plaintiff*

16

# EXHIBIT 2

Person/Attorney Filing: Alden A Thomas
Mailing Address: 3200 N Central Ave, Suite 2000
City, State, Zip Code: Phoenix, AZ 85012
Phone Number: (602)214-1000X1010
E-Mail Address: aat@jaburgwilk.com
[  ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 031900, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PINAL

Stefanos Pontikis
Plaintiff(s),
v.
Lucid USA, Inc., DBA Lucid Motors
Defendant(s).

Case No.   S1100CV202201753

**SUMMONS**

To: Lucid USA, Inc., DBA Lucid Motors

**WARNING: THIS AN OFFICIAL DOCUMENT FROM THE COURT THAT
AFFECTS YOUR RIGHTS.  READ THIS SUMMONS CAREFULLY. IF YOU DO
NOT UNDERSTAND IT, CONTACT AN ATTORNEY FOR LEGAL ADVICE.**

1.  A lawsuit has been filed against you. A copy of the lawsuit and other court papers were
    served on you with this Summons.

2.  If you do not want a judgment taken against you without your input, you must file an
    Answer in writing with the Court, and you must pay the required filing fee. To file your
    Answer, take or send the papers to Clerk of the Superior Court, 971 Jason Lopez Circle
    Building A, Florence, Arizona 85132 or electronically file your Answer through one of
    Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation.
    Mail a copy of the Answer to the other party, the Plaintiff, at the address listed on the top
    of this Summons.
    Note: If you do not file electronically you will not have electronic access to the documents
    in this case.

3.  If this Summons and the other court papers were served on you within the State of
    Arizona, your Answer must be filed within TWENTY (20) CALENDAR DAYS from the
    date of service, not counting the day of service. If this Summons and the other court papers
    were served on you outside the State of Arizona, your Answer must be filed within
    THIRTY (30) CALENDAR DAYS from the date of service, not counting the day of
    service.

AZturboCourt.gov Form Set #7256842

Requests for reasonable accommodation for persons with disabilities must be made to the court by parties at least 3 working days in advance of a scheduled court proceeding.

GIVEN under my hand and the Seal of the Superior Court of the State of Arizona in and for the County of  PINAL

SIGNED AND SEALED this date:*September 30, 2022*

*Rebecca Padilla*
Clerk of Superior Court

By:*MMASTERS*
Deputy Clerk



# EXHIBIT 3

# In the Superior Court of the State of Arizona
# In and For the County of Pinal

**Plaintiff's Attorney:**
Alden A Thomas
Bar Number: 031900, issuing State: AZ
Law Firm: Jaburg & Wilk, P.C.
3200 N Central Ave, Suite 2000
Phoenix, AZ 85012
Telephone Number: (602)214-1000X1010
Email address: aat@jaburgwilk.com

**Plaintiff:**
Stefanos Pontikis
3200 N Central Ave. Suite 2000
Phoenix, AZ 85012
Telephone Number: (602)000-1000
Email address: aat@jaburgwilk.com

**Defendant:**
Lucid USA, Inc., DBA Lucid Motors
8825 N. 23rd Ave. Suite 100
Phoenix, AZ 85021

Discovery Tier t1

Case Category: Other Civil Case Categories
Case Subcategory: Employment Dispute - Other

CN2 **02201753**

JOSEPH R. GEORGINI

AZTurboCourt.gov Form Set #7256842

Civil Cover Sheet
Page 1 of 1

MM

# EXHIBIT 4

FILED
Rebecca Padilla
CLERK, SUPERIOR COURT
09/30/2022  6:14PM
BY: MMASTERS
DEPUTY

Case No.: S1100CV202201753
HON.  THE HON JOSEPH R GEORGINI

Person/Attorney Filing: Alden A Thomas
Mailing Address: 3200 N Central Ave, Suite 2000
City, State, Zip Code: Phoenix, AZ 85012
Phone Number: (602)214-1000X1010
E-Mail Address: aat@jaburgwilk.com
[ ☐ ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 031900, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF PINAL

Stefanos Pontikis
Plaintiff(s),
v.
Lucid USA, Inc., DBA Lucid Motors
Defendant(s).

Case No.

**CERTIFICATE OF
COMPULSORY ARBITRATION**

I certify that I am aware of the dollar limits and any other limitations set forth by the
Local Rules of Practice for the Pinal County Superior Court, and I further certify that
this case IS NOT subject to compulsory arbitration, as provided by Rules 72 through 77 of
the Arizona Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this

By:  Alden A Thomas /s/
     Plaintiff/Attorney for Plaintiff

# EXHIBIT 5

FILED
Rebecca Padilla
CLERK, SUPERIOR COURT
12/01/2022 3:12PM
BY: RPERRONE
DEPUTY

1 | **Jaburg & Wilk, P.C.**
3200 N. Central Avenue, 20th Floor
2 | Phoenix, AZ 85012
602.248.1000
3
Alden Thomas (031900)
4 | aat@jaburgwilk.com

5 | *Attorney for Plaintiff*

6

SUPERIOR COURT OF ARIZONA
7 | COUNTY OF PINAL

8

9 | STEFANOS PONTIKIS,                        Case No.: S1100CV202201753

10 |          Plaintiff,

11 |     v.                                   **WAIVER OF SERVICE OF PROCESS**

12 | LUCID USA, INC., a Delaware
corporation, d/b/a LUCID MOTORS,
13
Defendant.
14

15

16 | TO:    Alden Thomas, Counsel for Plaintiff, Stefanos Pontikis

17 |          I acknowledge receipt of your request to waive service of a summons in the action

18 | of *Pontikis v. Lucid USA, Inc. dba Lucid Motors* in the Superior Court of the State of

19 | Arizona in and for the County of Pinal.  I have also received a copy of the Complaint and

20 | Certificate of Compulsory Arbitration in this action, an electronic copy of this instrument,

21 | and a means by which I can return the signed waiver to you without cost to me.  I agree

22 | to save the cost of service of a summons and an additional copy of the complaint in this

23 | lawsuit by not requiring that I, or the entity I represent, be served with judicial process in

24 | the manner provided by the Arizona Rules of Civil Procedure.

25

26

22552-22552-00001\\AAT\\LAU\\5297743.1

1    I understand that I, or the entity I represent, will retain all defenses or objections
2  to the lawsuit or to the jurisdiction or venue of the court except for the objections based
3  on a defect in the summons or in the service of the summons.

4    I understand that a judgment may be entered against me, or the entity I represent,
5  if an answer or motion under Rule 12 is not served upon you within sixty (60) days after
6  **November 4, 2022**, or within ninety (90) days after that date if the request was sent
7  outside the United States.

8

9    DATED this 15ᵗʰ day of November 2022.
10

11

12    Jacob Valdez
13    Pavneet Uppal
14    Attorneys for Defendant Lucid USA, Inc.,
      dba Lucid Motors
15

16

17

18

19

20

21

22

23

24

25

26

2

**Duty to Avoid Unnecessary Costs of Service of Summons**

Rule 4.1 and Rule 4.2 of the Arizona Rules of Civil Procedure require certain parties to cooperate in saving unnecessary costs of service of the summons and a pleading. A defendant located in the United States who, after being notified of an action and asked by a plaintiff located in the United States, to waive service of a summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return the waiver.

It is not good cause for a failure to waive service that a party believes the complaint is unfounded, or that the action has been brought into an improper place of in a court that lacks jurisdiction over the subject matter of the action or over its person or property. A party who waives service of the summons retains all defenses and objections (except any related to the summons or the service of the summons) and may later object to the jurisdiction of the court or to the place where the action has been bought.

A defendant who waives service must, within the time specified on this waiver form, serve on the plaintiff's attorney (or unrepresented plaintiff) a response to the complaint and served within this time a default judgment may be taken against that defendant by waiving service, a defendant is allowed more time to answer than if the summons had been actually served when the request for waiver of service was received.

3

# EXHIBIT 6

FILED
Rebecca Padilla
CLERK, SUPERIOR COURT
11/29/2022 10:45AM
BY: RPERRONE
DEPUTY

1
2
3
4
5

Stefanos Pontikis
4475 Trinity Mills Rd.
Ste. 700092
Dallas, TX 75370
(586) 610-3421
stevepontikis@gmail.com

*Appearing Pro Se*

6
7
8

## SUPERIOR COURT OF ARIZONA

## COUNTY OF PINAL

9
10
11
12
13
14
15

**STEFANOS PONTIKIS,**

        *Plaintiff,*

    v.

**LUCID MOTORS USA, INC.,** a Delaware
corporation, d/b/a LUCID MOTORS,

        *Defendant.*

Case No.: S1100CV202201753

**AMENDED COMPLAINT**

Honorable Joseph R. Georgini

16
17

Stefanos Pontikis ("Plaintiff") alleges:

18

## PARTIES, JURISDICTION, AND VENUE

19
20
21

    **1.**    Plaintiff Stefanos Pontikis is a Texas citizen residing in Southlake, Tarrant County, Texas.

22
23
24

    **2.**    From January 4, 2021 through April 10, 2021, Pontikis worked as a "Logistics Operations Supervisor" ("LOS") for Defendants Lucid Motors USA, Inc., d/b/a Lucid Motors ("Lucid").

25
26
27
28

    **3.**    Pontikis was previously employed as an "employee" by Lucid as per Ariz. Admin. Code § 6-3-1723, and a dispute between the parties arose from that employment relationship.

4.      Lucid is an Arizona employer and an American electric vehicle manufacturer.

5.      Lucid is headquartered in California and was incorporated in Delaware.

6.      Lucid is and was at all times pertinent registered to do business in Arizona.

7.      Lucid's manufacturing operations are located in or around Casa Grande, Arizona.

8.      Lucid is an "employer" as defined under AZ Rev Stat § 43-402.

9.      Lucid is a citizen of Pinal County, Arizona, because a corporation resides for venue purposes in any district where the defendant corporation is subject to personal jurisdiction when the suit is filed.

10.     This Court has jurisdiction over this matter under A.R.S. § 12-123.

11.     Venue is proper in this court because the acts and omissions giving rise to Pontikis's claims occurred in Pinal County.

## GENERAL ALLEGATIONS

12.     On December 9, 2020, Lucid offered Stefanos Pontikis the position of Logistics Operations Supervisor at its Casa Grande, Arizona location.   The letter offering him this position stated that he would be directly reporting to Operations Manager, David Tasker.

13.     Pontikis's understanding when accepting Lucid's job offer was that, as a condition of his acceptance of the offer, he would be promoted into a managerial role sometime during the second quarter of 2021 or when the first managerial slot/requisition opened up in the Operations Department.

14.     On January 4, 2021, Pontikis started work as a Logistics Operations Supervisor for Lucid.

**15.** Within a few weeks of starting work for Lucid, Pontikis contracted the COVID-19 virus.

**16.** On or about January 20, 2021, Pontikis informed his Logistics Operations Manager and supervisor, David Tasker, that he tested positive for COVID-19.

**17.** On or about January 26, 2021, in response to receiving information that Pontikis had tested positive for COVID-19, Tasker gave him a direct order to make a false statement to Lucid's HR department regarding Pontikis' contact with other employees shortly before he tested positive for COVID-19.

**18.** Lucid's Logistics Manager David Tasker, via text message and verbally, explained to Pontikis that he did not want to have to quarantine his entire staff and risk shutting down operations on account of Pontikis testing positive for COVID-19.

**19.** Despite his own reservations, Pontikis deferred to Tasker and reluctantly followed the direct order given to him by his supervisor.

**20.** In a February 8, 2021 meeting that Pontikis requested with Craig Watson, Pontikis felt compelled to express his concerns regarding the direct order given to him by Tasker and the status of his fulfillment of that order.

**21.** During this meeting, Pontikis explained he was going to recant the false statement David Tasker directed him to make and correct the record with HR.

**22.** Pontikis reported his concerns because he had a reasonable basis to believe Tasker's directive violated Arizona law and/or public policy.

**23.** For example, A.R.S. § 36-621, *et. seq.* outlines specific requirements for the reporting of infectious and contagious diseases to appropriate government personnel.

**24.** A.R.S. § 36-624 permits county health departments to adopt quarantine and sanitary measures to prevent the spread of infectious and contagious diseases.

**25.** At all relevant times, Pinal County had adopted CDC recommendations for quarantine and isolation related to COVID-19.

**26.** In response, Watson did not take any action to address the issue. Instead, he presented several options/scenarios to Pontikis:

    **a.** say nothing to HR and pretend the issue never happened;

    **b.** inform HR and correct the record but to expect retaliation from Tasker based on his temperamental nature;

    **c.** Watson could relocate either Pontikis or Tasker to a different *off-site* Lucid location in an attempt to avoid any potential conflict or retaliatory actions taken by Tasker as a result of Pontikis's report to HR; and/or

    **d.** Pontikis could expect a write-up to be placed in his *"jacket"* (employee record) from Watson that would prohibit him from receiving a promotion to manager once an opening became available in the second financial quarter of 2021.

**27.** On or about February 10, 2021, Pontikis recanted his original statement to HR and explained the burden placed on him by his manager. HR launched an investigation led by Imari Henderson, the Employee Relations Partner ("ERP") who interviewed all involved parties. The investigation was concluded on March 18, 2021, but Defendant did not inform Pontikis as to what actions would be taken going forward.

**28.** On or about the first week of March 2021, Pontikis was struggling to understand how employee morale was so low. He began asking some of his coworkers about

their perceived reasons for such a hostile and antagonistic work environment at Lucid.

29.     Upon asking his coworkers about their perceived reasons for the hostile and antagonistic work environment at Lucid, Pontikis was informed that an employee chat group existed on an application known as "WhatsApp," of which Pontikis was not a member.  The purpose of the forum/chat group was to vent and discuss personal and work-related issues both directly and indirectly related to Lucid operations.  Plaintiff was presented with some of the content from the chat group upon request from a fellow coworker.

30.     After reporting to HR the directive he was given by Tasker to provide false information, Pontikis began experiencing retaliation in various forms.  For example, on or about March 16, 2021, at approximately 8:30 a.m., Pontikis was approached by Tasker and interrogated about his work attire.  In particular, Pontikis was asked why he was not wearing his company shirt.

31.     Pontikis explained he was, indeed, wearing such attire underneath his sweater because it was extremely cold on the dock during the morning hours.  Pontikis explained that he had always worn a casual, polo sweater during the morning hours on the dock which covered his company shirt and had never been approached or questioned by Tasker as to such attire until the close of the investigation on the Complaint Pontikis submitted to HR.

32.     The Employee Handbook at page 14 requires employees to "maintain the highest standards of personal cleanliness and present a neat, professional appearance at all times."  It does not require employees to wear company shirts.  In fact, to the contrary, the Employee Handbook gives employees discretion as to how they satisfy such standard: "All employees should use discretion in wearing attire that is appropriate for the office and

customer interaction."

33.     Tasker, who had never previously made any statements about Pontikis's dress attire prior to March 16, 2021, stated, "Watson will not be happy with you for not wearing your company polo shirt" and walked away.

34.     Another co-worker who wore similar attire as Pontikis (an athletic hooded sweatshirt) who was in the direct walking path of Tasker was never approached or questioned about his attire.

35.     The Lucid work culture, pertaining to the logistics department, is and was at all times relevant, a very close-knit group of employees that frequently engaged in various after-work activities.

36.     On or about March 19, 2021, Pontikis was attending a birthday party event for another supervisor.  The other supervisor invited Pontikis.

37.     At that party, Pontikis was informed by two other work colleagues that Pontikis's Logistics Manager David Tasker stated to them that he was very displeased with Pontikis's presence at the event.

38.     The same two co-workers informed Pontikis that Tasker was displeased by his presence at the party and that Tasker also them that he did not want Pontikis to continue his employment with Lucid.

39.     Pontikis received unwelcomed, unprofessional, and unpleasant gestures from Tasker during the event to such an extent that Pontikis grew increasingly disturbed and felt extremely ostracized. It became very apparent shortly after Pontikis arrived at the party that Tasker was retaliating against him by making unsolicited, disparaging comments to other

employees about Pontikis.

**40.** At one point during the party, Tasker's spouse approached Pontikis and expressed her sympathies in relation to Pontikis having to work for her husband. Pontikis's two co-workers expressed to him earlier that evening that Tasker was completely disengaged with Pontikis throughout the event and eventually left disgruntled by Pontikis's presence.

**41.** On or about March 22, 2021, Pontikis was asked by a coworker why he did not attend an off-site work event on March 20, 2021. The event was hosted at Tasker's home. Pontikis was informed that all the employees in Pontikis's department were in attendance. Pontikis informed them that Tasker did not extend him an invitation.

**42.** Pontikis's coworker further stated that he was directed to destroy and delete all messages in his WhatsApp group account for fear that such communications would "possibly expose them all and their behaviors."

**43.** Pontikis's health was regressing due to the workplace issues he was experiencing which directly impacted his known disability.

**44.** On or about March 23, 2021, Pontikis submitted a time-off request via email to his manager, Tasker, requesting April 9, 2021 off so he could travel home for a medical appointment to obtain his COVID-19 vaccination, and to tend to other medically necessary reasons, some of which had been either newly created or exacerbated by the stress Pontikis was forced to endure while working with Lucid.

**45.** On March 23, 2021, Pontikis sent a letter via email to HR wherein he expressed his concerns related to his work relationship with Tasker and the toxicity of the work environment, which Pontikis felt was being fueled by Tasker.

46.     In Pontikis's March 23, 2021 letter to HR, he raised concerns about the toxicity and hostile nature of the work environment at Lucid.

47.     In Pontikis's March 23, 2021 letter, he also included various examples of inappropriate messages and images expressed on a group chat amongst Lucid employees on the application WhatsApp.  Examples of the type of messages exchanged are included in **Exhibit 1** to this Complaint which serves as Plaintiff's resignation notice on April 9, 2021.

48.     Some of the messages from the group chat contained references to people on Lucid's management team as "faggots" and "gay pussies."

49.     Some of the messages joked about employees in leadership roles being drunk or intoxicated during work hours while on Zoom meetings.

50.     Some of the images sent include fully exposed male genitalia.

51.     The group chat consisted primarily of Lucid employees and was created by Senior Logistics Manager Craig Watson and categorized as "(Not work related) Team," but many of the messages themselves referenced work and work-related matters.

52.     After Pontikis reported these issues to HR, Lucid's Employee Relations Partner, Imari Henderson and HR, opened a second investigation.

53.     On March 24, 2021, Tasker rejected Pontikis's request for paid sick time off but explained to Pontikis that he would need to find a replacement, first, if he wanted the time off.

54.     One of Pontikis's coworkers informed him that Watson directed this coworker to "stay away and distance himself" from Pontikis.  The reason stated for the request was that Watson could not yet fire Pontikis and if he did it would cause a "shit storm."  The coworker further stated that this order included a negative ultimatum if he did not comply.

**55.**     On or about March 25, 2021, Craig Watson informed Pontikis that he (Watson) no longer planned to promote Pontikis to Logistics Operations Manager as promised prior to Pontikis being hired.   Instead, Watson informed Pontikis that when the next Logistics Operations Managerial position opened up, one of the members of the group chat—Kevin Rafferty—would fill it.   He further noted that plans were underway to sponsor Rafferty's expired immigrant work visa.

**56.**     When faced with the imminent likelihood that he would be terminated (which Watson and Tasker repeatedly expressed they planned to do), and the toxic and hostile work environment, Pontikis tendered his resignation effective April 10, 2021 due to the immense, highly pressured, and unbearable working conditions he was subjected to for many weeks.

**57.**     At all times pertinent hereto, Lucid was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Defendant.

**58.**     At all times pertinent hereto, Lucid's conduct as well as that of its agents, servants, and/or employees was egregious, malicious, intentional, willful, reckless, and in habitual and negligent disregard for state laws and the rights of the Plaintiff herein.

**59.**     The perpetrators of the illegal offenses directed at Pontikis are still presently employed by Lucid. Considering this fact, a reasonable person faced with such intolerable employer actions or conditions of employment would have no reasonable alternative except to resign as the threat of ongoing retaliation would always be imminent.

## COUNT ONE

### FAILURE TO PROVIDE PAID SICK TIME
### IN VIOLATION OF A.R.S. § 23-373 *et seq.*

**60.**    Pontikis repeats and realleges each allegation of this Complaint as if fully set forth in this claim.

**61.**    Arizona adopted a paid sick-time law that mandates that an employee may use his paid sick time ("PST") for any qualifying reason, including when the employee is suffering from a physical illness or a health condition. *See* A.R.S. § 23-373(A)(1).

**62.**    It is "unlawful for an employer or any other person to interfere with, refrain, or deny the exercise of, or the attempt to exercise" an employee's right to take paid sick time. A.R.S. § 23-374(A).

**63.**    "An employer may not require, as a condition of an employee's taking earned paid sick time, that the employee search for or find a replacement worker to cover the hours during which the employee is using earned paid sick time." A.R.S. § 23-373(E).

**64.**    As set forth herein, Pontikis requested to use paid sick time on March 23, 2021, and made a good faith effort to provide his employer with advance notice as per A.R.S. § 23-373(C). His request was made to his manager, David Tasker, via email, nearly three (3) weeks in advance of the requested PST day off on April 9, 2021.

**65.**    Pontikis's request was wrongfully denied on March 24, 2021 because there was another supervisor that would be out that day as explained by his manager and Pontikis was directed to find a replacement if he wanted to use his PST. Such a requirement by the defendant is a direct violation of the law under A.R.S. § 23-373(E).

**66.**     Pursuant to A.R.S. § 23-364(G):

"Any employer who fails to pay the...earned paid sick time required under this article shall be required to pay the employee the balance of the...earned paid sick time owed, including interest thereon, and an additional amount equal to twice the...earned paid sick time."

**67.**     Pontikis is entitled to a judgment for triple the amount of his unpaid sick time plus interest thereon and mandatory attorneys' fees. A.R.S. § 23-364(G).

## COUNT TWO

### UNLAWFUL RETALIATION IN VIOLATION OF A.R.S. § 23-374 *et seq.* and ENFORCEMENT UNDER A.R.S. § 23-364 *et seq.*

**68.**     Pontikis repeats and realleges each allegation of this Complaint as if fully set forth in this claim. More specifically, Plaintiff realleges ¶¶ 16 through 56.

**69.**     The PST Act contains an anti-retaliation provision that states:

"It shall be unlawful for an employer or any other person to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right protected under this article." (A.R.S. § 23-374(A)).

"An employer shall not engage in retaliation or discriminate against an employee or former employee because the person has exercised rights protected under this article." (A.R.S. § 23-374(B)).

"It shall be unlawful for an employer's absence control policy to count earned paid sick time taken under this article as an absence that may lead to or result in discipline, discharge, demotion, suspension, or any other adverse action." (A.R.S. § 23-374(C)).

**70.**     Pontikis's manager, Tasker, knowingly and willfully interfered with Pontikis's right to utilize his PST when he rejected the request of Pontikis on March 24, 2021 based on the fact that over the course of several weeks prior to Pontikis making said PST request, Tasker engaged in acts of retaliation against Pontikis for recanting his false statement made, under duress, to HR regarding his exposure to COVID-19. Such actions by the defendant are

in violation of A.R.S. § 23-374(A).

71.     Furthermore, Defendant egregiously and maliciously denied Pontikis's PST request as evidenced by the discriminatory treatment Pontikis received weeks prior to his request being made due to Pontikis expressing concerns with HR and causing an investigation to be initiated on two occasions based on unlawful behaviors being demonstrated by the defendant as set forth herein. This, too, is a violation under A.R.S. § 23-374(B).

72.     Defendant knew or should have known that by requiring Plaintiff to find a replacement as a contingency to being granted the requested PST, was a direct violation under A.R.S. § 23-373(E). As such, the defendant knew or should have known that it was extremely unlikely that Plaintiff could overcome the condition placed on Pontikis. Defendant was fully aware at all times pertinent to the plaintiff's request for PST, that said time was earned PST, and that Pontikis's use of such earned time while foregoing to find a replacement would adversely subject him to discipline, discharge, demotion, or suspension especially in full consideration of the retaliation that Pontikis was already being suffered to endure. The defendant's actions clearly demonstrate a violation under A.R.S. § 23-374(C).

73.     A.R.S. § 23-364(B) states:

"Taking adverse action against a person within ninety days of a person's engaging in the foregoing activities *shall raise a presumption that such action was retaliation, which may be rebutted by clear and convincing evidence* that such action was taken for other permissible reasons." (Emphasis added.)

74.     Furthermore, A.R.S. § 23-364(G), the statute's anti-retaliation provision, states:

"Any employer who retaliates against an employee or other person in violation of this article shall be required to pay the employee an amount set by the commission or a court sufficient to compensate the employee and deter future violations, but not less than one hundred fifty dollars for each day that the violation continued or until legal judgment is final." (A.R.S. § 23-364(G)).

75.     As set forth above, the Defendants retaliated against Pontikis within 90 days after he requested and was denied paid sick time.

76.     Accordingly, Defendants have the burden to prove, by clear and convincing evidence, that each of their adverse actions taken against Pontikis was wholly unrelated to his request to use paid sick time at a time that Defendants found to be inconvenient.

77.     Defendants must pay Pontikis a *minimum* of $150 per day from the date of the initial act of retaliation, March 23, 2022, or when it first denied his request for paid sick time and subsequently retaliated against Plaintiff for requesting to use PST. Such payment of $150 per day shall accrue until this matter is resolved as per A.R.S. § 23-364(G).

78.     In addition to the defendant violating unambiguous provisions of the statute as described herein, Defendant failed to have posted in a conspicuous location at their physical work location, notices in such a format as specified by the commission, notifying employees of their rights under this respective article. Therefore, Defendant is in violation of A.R.S. § 23-364(D) which raises a rebuttable presumption that Defendant failed to act accordingly in paying and allowing Pontikis to use his earned paid sick time. Consequently, the defendant should be assessed civil penalties under A.R.S. § 23-364(F).

## COUNT THREE

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ("IIED")

79.     Pontikis repeats and realleges each allegation of this Complaint as if fully set forth in this claim.

80.     Plaintiff recanted and, thereby, refused as a former employee to commit an

outrageous act on February 8, 2021 that would violate the Constitution of Arizona or the statutes of this state.   Pontikis disclosed in a reasonable manner to the defendant or a representative of the defendant that he had information or a reasonable belief that his former employer or the defendant violated the Constitution of Arizona or the statutes of this state.

81.    Lucid retaliated against Pontikis for refusing to withhold information about his COVID-19 diagnosis so that other employees could be made aware of their potential exposure and act accordingly. Such actions are deemed extreme and outrageous due to the nature and extent of the retaliation carried out against Plaintiff as specified herein.

82.    Pontikis notified HR of the directive he was given by his Operations Manager David Tasker to provide false information regarding his exposure to other Lucid employees around the time he contracted COVID-19.  He believed such directive to be in violation of Arizona law and public policy, including but not limited to:

      **a.**  A.R.S. § 36-621; and

      **b.**  A.R.S. § 36-624.

83.    Pontikis also notified HR of the retaliation he was experiencing, various aspects of the hostile and toxic work environment he was experiencing, and the insulting, demeaning, and harassing communications being circulated by other employees—including those in management.  He reported he believed such conduct to be in violation of Arizona law and public policy.

84.    As set forth herein, Lucid retaliated against Pontikis in a multitude of ways— aggregating to create an overall toxic and hostile working environment—such that any reasonable person would feel compelled to resign, including but not limited to:

**a.** Being passed up for a promotion to Logistics Manager that he was promised when hired that he would receive in the second quarter of 2021;

**b.** Being publicly reprimanded for violating company policies that did not exist and/or were not uniformly applied to all employees;

**c.** Prohibiting at least one other Lucid employee from communicating with or interacting with Pontikis;

**d.** Making negative and derogatory comments about Pontikis to his coworkers when he was not present;

**e.** Expressing to Pontikis's coworkers an intent to terminate Pontikis's employment with Lucid at an unspecified future date; and

**f.** Ostracizing him and failing to include him in work-related conversations and electronic correspondence utilized for work- and non-work-related communications.

85.   As a result of this retaliation, Pontikis was forced to endure an immense amount of pain, suffering, degradation, unwanted humiliation, and stress on the job which ultimately culminated in Pontikis feeling compelled to resign under pressure.

86.   To add insult to injury, Pontikis was informed that the management position he was told he would get when he was hired would be given to one of the people who was in the chat group that exchanged wildly inappropriate messages without reporting them, making it all too clear to him that keeping silent about illegal activities was something that would be rewarded but reporting such would lead to retaliation.

87.   Defendant intended to cause emotional distress and recklessly disregarded the rights of Pontikis.   It is with a near certainty that such distress would result from the

defendant's conduct. Consequently, as a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer losses in earnings, equity and other employment benefits, and has incurred other economic and non-economic losses in the form of:

      **a.** financial losses – lost potential job opportunities, loss of income due to substantially reduced income, home foreclosure, increased debts due to the inability to pay;

      **b.** emotional pain and suffering in the form of legal separation from spouse, anxiety and depression;

      **c.** physical illness and disability resulting in loss of bodily function(s).

88. Defendant knew or should have known that its intentional and hurtful acts in the form of forcing Plaintiff to lie about public health and safety policies, denial of employment promotion opportunities, retaliation, denial of use of earned paid sick time to seek medical treatment, isolating Pontikis from other coworkers as a way of retaliation, making negative, false, and disparaging comments about Pontikis to his work peers with the intent to demean, harass and antagonize the plaintiff would certainly cause emotional distress and suffering.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff requests a judgment against Defendants as follows for:

    **a.** lost wages and benefits,

    **b.** front pay and benefits,

    **c.** compensatory damages,

    **d.** consequential damages,

    **e.** punitive damages,

    **f.** prejudgment interest at the highest legal rate from the date due until the date of Judgment,

g.  reasonable attorneys' fees pursuant to A.R.S. § 23-364,

h.  costs,

i.  interest on the foregoing amounts at the highest legal rate from the date of Judgment until paid; and

j.  such other and further relief as is proper and just.


Respectfully submitted,

/s/ *Stefanos Pontikis*          Dated:  November 29th, 2022
Stefanos Pontikis
Plaintiff in Pro Per


# CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2022, the foregoing document was filed with the Clerk of the Court via its electronic server and served upon the defendant(s) to their authorized registered agent, and via a third-party process server service, along with the appropriate summons issued from the Clerk of the Court.


/s/ *Stefanos Pontikis*          Dated:  November 29th, 2022
Stefanos Pontikis

**Date:**    9th, April 2021

**From:**    Stefanos Pontikis

**To:**    Lucid Motors Management Team

**Re:**    Resignation Notice

Dear Management Team,

After carefully assessing my work relationship over the few months since I joined the Lucid organization, and in consultation with my family and my personal physician, it is with great disappointment that I am forced to resign from the company effective today this **9th day of April 2021**. My decision is based wholly on the turn of events throughout my time with the company.

The issues surrounding my resignation primarily entail some of the issues I described in a previous email sent to HR on March 22nd. Since that time, the work environment has become more charged, toxic and the trust, confidence and respect an employee would ordinarily have of organizational leadership has been greatly diminished considering my personal work experience(s) with some of the operational leaders. Despite the internal investigations regarding workplace improprieties I have reported, some issues are still not resolved and those very issues speak to the core of the work culture. Such issues will continue to have a profound but negative impact on how Lucid will launch…be viewed in the public eye…be viewed by its investors…and, ultimately, compete in the automotive electric car manufacturing industry.

As an employee who strives to act with integrity, ethically, professionally and as someone who recognizes that people in the workplace should be treated fairly, dealt with honestly, and at all times treated in a non-discriminatory manner, I have been shocked too many times at the lack of candor and decency evinced by some of Lucid's critically appointed operational leaders. I have still been retaliated against directly and indirectly at work, and outside of work for *"doing the right thing"* by addressing my manager's unlawful and highly unethical directive. Now, and even more troubling is evidence recently discovered which has revealed a social media forum/chat group comprised of only Lucid employees that consists of conversational content that is plainly disgusting, perverted, sickening to the mind, indecent, malicious, unprofessional, degrading, unspeakable, and discriminatory on just about every level under Title VII of the Civil Rights Act.  The open, candid, expressions of the Lucid employees' comments and opinions regarding other Lucid employees and just people in general are simply disturbing and a dark stain that could potentially taint the reputational image of Lucid Motors. Such outrageous behaviors and statements made with such arrogance, ignorance and impunity is directly reflective of Lucid's core operational team.

1

As a fairly new employee, it is incomprehensible having to acknowledge the fact that the work environment I am expected to be a part of is incredibly *sexist, demeaning, deplorable and grotesquely degrading* against women…





…and brutally *demoralizing* and *mysogynistic*…





…*racially insensitive* and *highly inflammatory*…(see email attachment for video clip)



…*insulting* and *homophobic*…





3

…pervertedly biased against people with disabilities…

 

…and totally *uncaring*, *irresponsible*, and *without concern* regarding company values and policies while engaging in work duties remotely.

 

Such behaviors and expressions are unacceptable whether inside or outside the work premises and should never be tolerated, condoned, or protected by any organization. The Lucid work culture identified herein is demonstrative of the toxicity and hostility of the daily operations and those who have fallen victim to managers who are expected to be trusted to set a positive example for the sake of the company. As such, and being a victim to two of Lucid's executive

4

leadership team members (Tasker, Watson), I find it not in my better interest to jeopardize my physical, emotional, spiritual and mental health/well-being by continuing to employ my valuable services to an organization whose values, ethics and principles have been greatly comprimised. While I am grateful for the employment opportunity Lucid Motors extended to me, I cannot, in good conscience, further subject myself to the pain and suffering I've been forced to endure as an employee and especially considering the fact that the *"good ol' boys network"* seems to prevail despite committing such egregious atrocities.

Thank you for the initial opportunity and please advise as to how and by what method I should return all company property.

Sincerely,

/s/  *Stefanos Pontikis*                         Dated: 9th April, 2021
Stefanos Pontikis
Manufacturing Supervisor

# EXHIBIT 7

**Jaburg & Wilk, P.C.**
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
602.248.1000

Alden Thomas (031900)
aat@jaburgwilk.com

*Attorney for Plaintiff*

**SUPERIOR COURT OF ARIZONA**
**COUNTY OF PINAL**

| | |
|---|---|
| STEFANOS PONTIKIS, | Case No.: S1100CV202201753 |
| Plaintiff, | |
| v. | **APPLICATION TO WITHDRAW AS COUNSEL OF RECORD WITH CONSENT** |
| LUCID USA, INC., a Delaware corporation, d/b/a LUCID MOTORS, | |
| Defendant. | (Expedited Consideration Requested) |

The law firm of JABURG & WILK, P.C., through Alden A. Thomas, counsel of record for Stefanos Pontikis, hereby requests to withdraw as attorney of record pursuant to Rule 5.3 of the Arizona Rules of Civil Procedure, with the consent of Stefanos Pontikis.

Stefanos Pontikis has terminated the services of Jaburg & Wilk, PC. effective November 29, 2022 and requested undersigned counsel to withdraw as of the termination notice date. It is hereby requested that copies of all future pleadings, notices, orders and documents in this matter be sent to Plaintiff Stefanos Pontikis. The address, email and telephone number for Stefanos Pontikis are:

Stefanos Pontikis
4475 Trinity Mills Rd., Ste. 700092
Dallas, Texas 75370
stevepontikis@gmail.com
(586) 610-3421

22552-22552-00001\\AAT\\JJB\\5328915.1

For the foregoing reasons, the law firm of JABURG & WILK, P.C., through Alden A. Thomas, respectfully requests that it be permitted to withdraw as counsel of record for Plaintiff STEFANOS PONTIKIS in this matter.

RESPECTFULLY SUBMITTED this __3rd__ day of December, 2022.

**Jaburg & Wilk, P.C.**

Alden A. Thomas
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
*Attorneys for Plaintiff*

## CONSENT TO WITHDRAWAL

I, Stefanos Pontikis, consent to the withdrawal of Alden A. Thomas and the law firm of Jaburg & Wilk, P.C. as counsel in the above matter.

DATED this __2nd__ day of December, 2022.

/s/ Stefanos Pontikis
Stefanos Pontikis

2

1   **ORIGINAL E-FILED** and
**COPY** of the foregoing emailed
2   this ___3rd___ day of December, 2022 to:

3   Jacob Valdez
Pavneet Singh Uppal
4   Fisher & Phillips LLP
3200 N. Central Ave., Suite 1550
5   Phoenix, AZ 85012
jvaldez@fisherphillips.com
6   puppal@fisherphillips.com

7   *Attorneys for Defendant Lucid USA, Inc.,*
*dba Lucid Motors*
8

9   /s/  Joy Brown
_____

10

**JABURG WILK**
LAW FIRM

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

3

1
2
3
4
5 **SUPERIOR COURT OF ARIZONA**
6 **COUNTY OF PINAL**

7 STEFANOS PONTIKIS,

8       Plaintiff,

9       v.

10 LUCID USA, INC., a Delaware
corporation, d/b/a LUCID MOTORS,
11
12       Defendant.

| | |
|---|---|
| | Case No.: S1100CV202201753 |
| | **ORDER GRANTING WITHDRAWAL AS COUNSEL OF RECORD WITH CONSENT** |

13

14       The Court having received Alden A. Thomas and the law firm of Jaburg & Wilk,

15 P.C.'s Application to Withdraw as Counsel of Record With Consent, and good cause

16 appearing;

17       IT IS ORDERED allowing Alden A. Thomas and the law firm of Jaburg & Wilk,

18 P.C, to withdraw as counsel of record for Plaintiff Stefanos Pontikis.

19
20       DATED this _____ day of December, 2022.

21
22
23                   _____
                  Superior Court Judge

24
25
26

# EXHIBIT 8

Case and Party Search    Case and Event Search

🛒 Shopping cart is Empty    azcourt@nationwidelegal.com    Message Center    Help

## « Back to search results

**Case Details**                                              Results 1 - 1 of 1 for . (0.01 seconds)

## Case Information

| Search Case Number | Case Filing Date | Case Title | Case General Category Description | Case Category Short Description | Case Status | Court Name | Judicial Officer Name |
|---|---|---|---|---|---|---|---|
| CV202201753 | 09/30/2022 | PONTIKIS VS LUCID USA INC | CIVIL | C56 | OPEN | Pinal County Superior | |

## Party Information

| First Name | Middle Name | Last Name | Date Of Birth | Role | City | State | Vehicle Registration Hold |
|---|---|---|---|---|---|---|---|
| | | JABURG & WILK, P.C. | | Attorney Firm | | | N |
| Alden | A | Thomas | | Attorney | | | N |
| | | STEFANOS PONTIKIS | | PLAINTIFF | PHOENIX | AZ | N |
| | | LUCID USA, INC. | | DEFENDANT | PHOENIX | AZ | N |

## Charge Information

| Charge Code | Charge Description | Charge Class | Disposition | Disposition Date |
|---|---|---|---|---|
| | | | | |

## Case Event Information

| Event Type Description | Event Date | Preview Document | Add to Cart | Add Certified Doc to Cart |
|---|---|---|---|---|
| COMPLAINT: Complaint | 09/30/2022 | | Add to Cart | Add Certified Document |
| SUMMONS: SUMMONS | 09/30/2022 | | Add to Cart | Add Certified Document |
| ARBITRATION: CERTIFICATE OF COMPULSORY ARBITRATION - IS NOT SUBJECT TO | 09/30/2022 | | Add to Cart | Add Certified Document |
| MISCELLANEOUS: Attachments | 11/29/2022 | | Add to Cart | Add Certified Document |
| COMPLAINT: AMENDED COMPLAINT | 11/29/2022 | | Add to Cart | Add Certified Document |
| SERVICE: WAIVER OF SERVICE | 12/01/2022 | | Add to Cart | Add Certified Document |

## Hearing Information

| CourtRoom Description | Date | Description | Description |
|---|---|---|---|
| No data available in table | | | |

# EXHIBIT 9

1   Pavneet Singh Uppal, SBN 016805
2   Jacob R. Valdez, SBN 035634
    FISHER & PHILLIPS LLP
3   3200 N. Central Avenue, Suite 1550
    Phoenix, Arizona 85012-2487
4   Telephone: (602) 281-3400
    Fax: (602) 281-3401
5   puppal@fisherphillips.com
6   jvaldez@fisherphillips.com
    Attorneys for Defendant
7

8             **SUPERIOR COURT OF ARIZONA**

9                 **PINAL COUNTY**

| | |
|---|---|
| 10  STEFANOS PONTIKIS, | Case No. S1100CV202201753 |
| 11          Plaintiff, | **NOTICE OF REMOVAL OF ACTION** |
| 12    v. | **TO THE UNITED STATES DISTRICT COURT, DISTRICT OF ARIZONA** |
| 13  LUCID USA, INC., a Delaware | |
| 14  corporation, d/b/a LUCID MOTORS, | |
| 15          Defendant. | |

17  **TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

18        **PLEASE TAKE NOTICE** that on December 5th, 2022, Defendant Lucid USA,

19  Inc., a Delaware corporation, d/b/a Lucid Motors (hereinafter "Defendant") filed a

20  Notice of Removal of this Action from the Superior Court of Arizona, County of Pinal,

21  to the United States District Court, District of Arizona. A true and correct copy of the

22  Notice of Removal of Action is attached as **Exhibit A**.

23        DATED this 5th day of December 2022.

24

25                  FISHER & PHILLIPS LLP

26                  By  /s/  Jacob R. Valdez
                      Pavneet Singh Uppal
27                      Jacob R. Valdez
                      3200 N. Central Avenue, Suite 1550
28                      Phoenix, Arizona 85012-2487
                      Attorneys for Defendant

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5th 2022, I electronically transmitted the attached document to the Clerk's Office using TurboCourt for filing, and I hereby certify that a copy of the foregoing document was served through TurboCourt and via U.S. Mail, postage prepaid, on the following:

Alden Thomas
Jaburg & Wilk, P.C.
3200 N. Central Avenue
20th Floor
Phoenix, AZ 85012
aat@jaburgwilk.com
Attorneys for Plaintiff

Stefanos Pontikis
4475 Trinity Mills Rd.
Ste. 700092
Dallas, TX 75370
(586) 610-3421
stevepontikis@gmail.com
Plaintiff


  /s/  Michelle C. Colwell

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 45795231.1